6 589
108 546

## SLEDGE'S Adm'rs, et al. v. CLOPTON.

1. C. delivered certain slaves to S., his creditor, the latter stipulating that when the wife of C. would pay him the debt intended to be secured by a pledge of the slaves, that he would settle them upon trustees to her separate use : the wife offered to pay the amount due to S., and demanded the slaves in obedience to his agreement; which he refuses : *Held*, that the contract of S. made him a trustee *sub modo* for the wife, and that the tender of his demand entitled her to go into equity to enforce the execution of the trust.

2. Where one person receives a conveyance of property, upon a verbal stipulation that he will dispose of it absolutely or conditionally for the benefit of another, he will be compelled to perform his engagement.

3. Where the question is, whether slaves were sold absolutely, or delivered as a pledge upon a promise that when the sum intended to be secured was paid, the person receiving them would settle them upon the creditor's wife, the difference between the debt and the value of the slaves, the failure to deny the right to redeem when the debt was tendered, and the declaration of the creditor made contemporaneously with the reception of the slaves, that he had bought them for the wife, are strong circumstances to show that they were not purchased unconditionally.

4. If one person receives property from another, under an agreement to settle it on trustees for the benefit of the wife of the latter, a court of equity should not refuse to coerce an execution of the trust, because the details of the settlement cannot be ascertained by the most stringent proof.

5. The loss of a private paper is sufficiently shown so as to admit secondary evidence of its contents, by proof that it could not be found where it was last seen, or amongst the papers of those persons to whom it would most probably be intrusted.

6. A party who has received property under an agreement to transfer it to a third person, cannot object to perform his contract because the party delivering it to him was indebted either to himself or others.

7. The statute of limitations of 1802, " For the limitation of actions," does not begin to run against a married woman, until she becomes *discovert*; nor will the staleness of the demand prevent a recovery, where the statute has not completed a bar.

Writ of error to the Court of Chancery sitting at Montgomery.

In December, 1841, the defendant in error filed her bill against the plaintiffs; and in July 1842, filed an amended bill. The allegations of both, so far as it is necessary to notice them, state that the complainant in 1812, in the State of Georgia, intermarried

with James B. Clopton, with whom, some time thereafter, she re-
moved to the town of Montgomery, in the State of Alabama.—
That shortly after the complainant's marriage, her father gave her,
by way of advancement, two female slaves, named Rose and
Scilla; some time thereafter, the former bore a female child, call-
ed Celia, and the latter three children, to wit, Hannah, Ben and
Washington. *Further*, that James B. Clopton, in 1828 or 9,
borrowed four hundred dollars of Chappell Sledge, the intestate
(who was the husband of the complainant's aunt;) and was other-
wise indebted to him in the sum of three hundred and twenty-
five dollars. For the twofold purpose of securing the re-pay-
ment of these several sums of money, and making a settlement
upon the complainant, her husband delivered the above named
slaves to the intestate, upon an agreement that he should retain
them in his possession until the debt due him, was paid, and that
thereafter he would by proper deeds, settle and convey them to
some proper person *in trust*, for the sole and separate use of the
complainant, in such manner that they should not be liable to the
debts or contracts of her husband.

It is alleged, that the slaves in question were worth, at the time
of this transaction, between fifteen hundred and two thousand
dollars; and that the intestate, when they were placed in his pos-
session, executed a writing, which he delivered to one Livingston,
the son-in-law of the complainant and her deceased husband for
safe keeping, but which is lost or mislaid, so that it cannot now
be produced. By that writing, the intestate acknowledged that
he held the slaves for the complainant, and that he would con-
vey them to trustees for her sole and separate use, so soon as he
was paid the sum of seven hundred and twenty-five dollars due,
as above stated.

The bill charges, that about the year 1830 or '31, the com-
plainant in company with a friend and relative, called on the in-
testate and offered to pay him the sum for which he held the
slaves in pledge, together with interest thereon, and requested
that he would convey the same to trustees for her sole and se-
parate use, according to the terms of his agreement. But with-
out denying that he held the slaves, on the terms and for the pur-
poses alleged, the intestate declined a compliance with the com-
plainant's request, assigning as reasons; that the complainant had
borrowed the money from the friend who accompanied her, and

that he had as well retain the possession as the friend in whose hands she would place them; and being assured that he was mistaken as to the source whence she had obtained the money, then he objected, because her husband owed him other debts.

It is also stated, that all the slaves, with the exception of Hannah, still remain in the possession of the intestate's administrators; that Hannah was loaned by intestate to Lucian Pinkston, who had intermarried with his daughter, Pamela. That at the time she was delivered by the intestate to his son-in-law, the latter was informed of the circumstances under which his father-in-law held her.

The bill avers that the complainant's husband died in September, 1836, intestate and very poor, so that no administrator of his estate has been appointed; that Chappell Sledge died in 1841, and his administrators have advertised the slaves (with the exception of Hannah) for sale, in order to make distribution of the estate among those entitled thereto. That the hire of the slaves from the time of the tender and demand by the complainant, up to the time of the death of Sledge, was more than sufficient to satisfy the sum, for the payment of which, they were intended as a security. The administrators and Pinkston and wife are made defendants; and the bill prays that the sale by the administrators be injoined, that an account be taken, and that the complainant be permitted to redeem the slaves, &c. and that they be settled on her as contemplated by the agreement between her husband and Sledge, &c.

The administrators in their answer, deny any knowledge of a a mortgage or conditional sale of the slaves to their intestate as alleged by the complainant—know nothing of any writing having been executed by their intestate, when he acquired the possession of the slaves, or at any other time—they had believed, and still do believe that the complainant's husband made an absolute sale of the slaves to their intestate; and insist that the several matters alleged, shall be proved.

Pinkston and wife answer, that they believe that Sledge was the owner of Hannah, under a purchase from the complainant's husband, for a full and fair consideration; and that he gave her to them shortly after their intermarriage, and when they were entirely ignorant of any claim by the complainant or any one else.

All the defendants in their answer, insist upon the statute of limitations, and also claim the benefit of a demurrer.

To show that the complainant's husband was indebted to the intestate, the administrators exhibited with their answer a deed of trust, from which it appears that he owed by promissory notes, bearing date the 20th January, 1830, a sum of money from seven to eleven hundred dollars; which was attempted to be secured by a transfer of property other than the slaves in controversy.

Benjamin F. Tarver, a witness for the complainants, states, that eleven, twelve or thirteen years ago, he accompanied her (by her request) to the house of Chappell Sledge, when she offered to pay him seven hundred and twenty-five dollars, with interest thereon, (if he desired it,) and demanded of him four or five negroes, the precise number, with their names and descriptions not remembered. The complainant stated to Mr Sledge, that she had come to redeem certain negroes which he held, and for which she tendered the money. Mr S. replied to the demand, that if she got the negroes back, they would have to be made over to some one for her, and that he had as well keep them as any one else. Witness does not remember that Mr S. claimed the negroes as his own, whether he admitted a trust for the complainant, or denied the right to re-purchase or redeem them.— He does not remember that the complainant asked permission to re-purchase the negroes as a favor, because they had been derived from her father, nor has he any recollection that any thing was said of a writing executed by Mr Sledge—he has no knowledge of such a writing.

Waldegrove Clopton, a witness for the complainant, testifies, that he is her son, that his father owned and had possession of the slaves in question, and that they were placed in Sledge's possession in virtue of some instrument which was drawn up by T. W. Livingston, a son-in-law of complainant. Witness has all the papers belonging to his father's estate in his possession, and has searched among them for the instrument referred to. He saw Sledge execute the writing, and Livingston fold it up and lay it on the table by which he sat. Witness heard only a portion of the writing read, and that related to a poney (which he claimed) and the negroes in question—it provided that Sledge should retain the property mentioned in it, until the complainant paid the money due him, when he was to make it over to her. Mr Sledge informed the complainant on the evening of the day the instrument was executed, or on the next day, that he

had let her husband have money, and would take the ne-groes in question, and when she paid him, she could have them; and desired her, if she had any objections, to make it known, and he would not take them away. The negroes were crying as they were about to leave, and Mr Sledge said to them, that they need not be disturbed, for complainant would make the money and bring them back. Witness was born on the first of January, 1818, and the transaction to which he refers, took place in the spring or fall of 1829. At the time the writing was executed, witness' father, Mr Sledge, T. W. Livingston and John S. Bailey were present—Mrs Mitchell and Mrs Lees came into the room, the former merely passed through, the latter stopped for a few moments.

Mrs Virginia Lees testifies to the transaction substantially, as does the last witness, and states, that seven hundred and twenty-five dollars was the sum to be paid by the complainant to Mr Sledge, before the slaves were to be given up by him. Witness states further, that about eighteen months after the negroes were delivered to Mr S. the complainant said to him, that in a short time she thought she would be able to raise the money he let her husband have, and supposed he would give up the negroes; to which he replied, whenever you pay me the money you shall have the negroes. Witness is a daughter of the complainant, and was the wife of T. W. Livingston, who is dead—had all his papers for four or five years, when she burned them—does not know that the writing signed by Mr. Sledge, was among them; though she saw it in her deceased husband's hands, after it was executed; but whether delivered to him for safe keeping, she cannot say.

Mrs Mary Mitchell was present when the transaction between complainant's husband and Mr Sledge, was being consummated, and very fully sustains Mrs. Lees in every thing that she says in relation to it, and also repeats the subsequent conversation between the complainant and Mr Sledge. This witness is silent as to the writing referred to by those who preceded her.

The second and third witnesses prove the death of the complainant's husband and Mr Sledge, at the time alleged, and they and Mrs Mitchell all state, that Britton D. Harris was not present when the agreement was completed. The two former also testify, that the writing which they saw executed, and heard read

in part, was not a deed to either Sledge or Ross, in trust for complainant or any one else.

Justus Wyman testifies, that in 1828 or '29, he was endeavoring to induce Chappell Sledge to secure or pay an indebtedness of Clopton to him, but he refused to do so. Sledge said that he had been advancing or paying money to Clopton on account of negroes, and had advanced to the extent of their value. He does not remember that he said that he bought them, or any thing about settling them on complainant, so that they could not be sold for Clopton's debts.

Wm. A. Campbell states, that in 1828 or '29, he had a conversation with Sledge, in which he said he had to buy the negroes of Dr. Clopton, for the benefit of the complainant. He did not state the terms and conditions—mentioned a woman and children, but did not state what woman or children, or how many children.

John L. Mitchell, from a vague and indistinct recollection of the value of slaves in 1828 and '29, expressed his opinion of the value of the slaves in question; according to the best of his recollection, they were worth about two thousand dollars. These are the only witnesses examined at the instance of the complainant.

Britton D. Harris, a witness for the defendants, states, that he is the half uncle of the complainant by consanguinity—knows all the negroes in controversy—held a lien on three of them, executed by Dr. Clopton, on the 19th September, 1829, to indemnify him as his surety. When the debt became due, Dr. C. was unable to pay it, and the three negroes embraced by the deed of trust, were sold to Mr Sledge, the intestate, who assumed the payment of the debt for which the witness was responsible—the complainant assented to the sale, remarking that she desired Mr Sledge to have them, instead of their going out of the family.— Witness does not know the amount of the purchase money—the sum from which he was relieved as a surety, was three hundred and eighty-one dollars and eighty-five cents—Mr Sledge purchased Scilla, Hannah, Ben and Washington, the latter having been born after the deed of trust referred to was executed. The sale was made at Dr. Clopton's house in the latter part of 1829, or in 1830—no one else was present but Dr. Clopton, complainant, Mr Sledge and witness—there was no written or verbal agreement entered into or spoken of, creating a trust or condition, but

the sale was absolute. The slaves mentioned above, were taken to Mr Sledge's plantation, and with the exception of Hannah, remained in his possession until his death, he always claiming and treating them as his own. Hannah was given to his daughter, Mrs Pinkston—witness never heard any complaint, that the price paid for the slaves was too small—he knows nothing of the sale of Celia, though she went with the others to Mr Sledge's.

Witness will not say positively, that there was no condition annexed to the sale, but he did not hear it—that he left Sledge at the place of Clopton's residence, and went home; on the second day thereafter, the negroes reached S's residence in the country.

An affidavit was admitted at the instance of the defendants, stating that the value of the slaves, at the time they were acquired by Mr. Sledge, was about twelve hundred dollars.

The chancellor was of opinion, that Sledge held the slaves as a security for seven hundred and twenty-five dollars; that sum being paid, he was to be treated as a trustee for the complainant, and was bound to execute the agreement to transfer them to the sole and separate use of the defendant; that the statute of limitations did not begin to run until the death of Dr. Clopton, an event which occurred within less than five years previous to the commencement of the suit. It was accordingly adjudged, that the right and title to the slaves be vested in the complainant, as also the increase since they went into Sledge's possession—all of whom are specially named. The master was also directed to take an account of the hire of the slaves from the time the complainants offered to pay Sledge the amount of his lien, making all reasonable allowances for raising the young negroes while their services were of no value, and for all expenses properly incurred about the slaves; that he ascertain the amount due to the administrators of Sledge for principal and interest upon the debt of seven hundred and twenty-five dollars, at the time of making the tender. *Further;* that the administrators of Sledge pay to the complainant, out of the estate of their intestate, the balance of the hire remaining after a deduction of principal and interest on the indebtedness aforesaid. *And lastly,* that they pay the costs of the suit from the estate of the intestate.

PECK, with whom was BALL, for the plaintiff in error, insisted—

1. That the testimony of Harris gave a correct version of the

transaction between Dr. Clopton and Mr. Sledge, and showed that there was a perfect sale without any qualification or condition.

2. The witnesses, Clopton and his sister, Mrs. Lees, were mistaken in supposing that there was a trust or condition evidenced by writing; and may have been honestly mistaken, by confounding the arrangement in respect to the slaves in question, with the deeds of trust to Sledge and Ross; in the former of which a power is included, and in the latter, slaves are conveyed for the separate use of the complainant.

3. The complainant's witnesses heard the paper, in respect to which they testify, read but in part, and their testimony is insufficent to identify and establish it; and if it is shown that such paper ever existed, which is denied, the proof does not show its loss.

4. If Sledge undertook to transfer the slaves to the separate use of the complainant after his demand was paid, it was a mere *nudum pactum*, and could not be enforced.

5. It cannot be intended, from the evidence, that seven hundred and twenty-five dollars was all that Dr. Clopton received for the slaves in question: the fair inference is, that Sledge paid eleven or twelve hundred dollars, which was a fair market price.

6. But if there was a reservation in favor of the complainants, it was void, because her husband was indebted at the time to other persons; and the record shows that some of those debts are still unpaid. [Rochelle v. Harrison, 8 Porter's Rep. 351.]

7. If there was not a valid trust, it could not be enforced so as to avoid the payment of the debt for which Dr. Clopton gave Mr. Sledge his note in January, 1830.

8. But if all other grounds of defence are unavailing, it is insisted, that the statute of limitations will bar a recovery, or the staleness of the demand must forbid its enforcement. [2 Story's Eq. 735; Lewin on Trusts, &c., 614–15–16; 1 Ala. Rep. N. S. 650; 2 Ala. Rep. N. S. 555.]

9. If neither of the points made be defensible, it is contended, that conceding the allegations of the bill are fully proved, Dr. Clopton did not divest himself of all right to the slaves in favor of his wife, after the debt due Sledge was paid. [Clancy on Rights, &c., 259–60; 2 Swanston's Rep. 109–10–11–12; 5 Ves. Rep. 71 to 78; 3 Dess. Rep. 149, 158; 10 Ves. Rep. 139; 7 Johns. Ch. Rep. 57; 2 Ala. Rep. 117, 669.] Even if it appeared that

the slaves in question were a part of the complainant's patrimony, they had been in her husband's possession *suo jure,* and she could not have them settled through the agency of a court of equity. [Clancy on Rights, &c. 440–1; 2 McC. Ch. Rep, 40; 4 Gill. & Johns. Rep. 282; 3 Cow. Rep. 590.]

10. The execution of the trust cannot be specifically enforced, because its terms are not shown with precision. [2 Mason's Rep. 468; 1 Pet. Rep. 600; Gresley's Eq. Ev. 192, note h; 10 Co. Rep. 92, b; 9 Wheat. Rep· 597; 4 Porter's Rep. 297; 2 Ala. Rep. 330; 2 Story's Eq.]

T. WILLIAMS, for the defendant in error, contended—

1. That the transaction between Dr. Clopton and Sledge was a mortgage; and the evidence shows, that the latter did not assert an absolute estate; but if it be doubful what is the character of the transaction, equity will construe it into a mortgage. [Dev. Eq. Rep. 373; 5 Litt. Rep. 84; 2 J. J. Marsh. Rep. 471; 3 id. 354.] The evidence of Harris does not prove the reverse. He speaks of an arrangement between Clopton and Sledge in an imperfect state, and which was doubtless modified and perfected on the same or the succeeding day, when W. Clopton, Mrs. Lees and Mrs. Mitchell were present. This conclusion is entirely reasonable, as Sledge was left by Harris in Montgomery, and the slaves did not reach his house in the country until two days afterwards.

2. Sledge had no lien, either in fact or in law, beyond the sum due and secured to him at the time the negroes were delivered. Dr. Clopton gave the equity of redemption to the complainant, and the mortgagee undertook, when he was paid, to convey it to trustees to her separate use. The right of the husband to confer such a bounty upon the wife, has not been disputed, and is regarded as clear. [Clancy on Rights, &c. 259, 279; 1 Atk. Rep. 270.]

3. The intestate obtained possession of the slaves in question under a promise that they should be transferred in trust for the complainant, upon a payment, by her, of seven hundred and twenty-five dollars; and neither himself or his administrators can be permitted to dispute the right of the *cestui que trust,* and set up an adverse claim. Such a pretension on the part of Sledge or his administrators, will be regarded a fraud, and treated as a breach of trust. [2. Ala. Rep. 596.]

4. The evidence of Tarver shows a tender of the money for which the negroes were mortgaged to Sledge within a year or two after they were delivered to him.

5. Where one person stipulates with another that something shall be done for a third person, the latter may sue even at law for a failure to perform it. [7 Johns. Ch. Rep. 57.]

6. It is immaterial whether the agreement to transfer the slaves to the complainant was founded on a valuable consideration. The intestate or his representatives could not set up the want of consideration: the intestate's undertaking estops him. Whether creditors may cause a sale of the slaves for the payment of their debts, is another question. [7 Johns. Ch. Rep. 63; 12 Ves. Rep. 103.] But mere indebtedness, or a single debt, is not sufficient to avoid a voluntary settlement. [5 Ves. Rep. 384; 8 Wheat. Rep. 248, 250.]

7. The point made by the answer is, not whether the equity of redemption was given to the complainant, but whether the negroes were sold absolutely to Sledge; if, then, the court is satisfied, that the transaction was a mortgage, the evidence need not be *entirely conclusive* to show that the complainant is entitled to the right she asserts.

8. Dr. Clopton's representatives (if any) need not be made parties: the bill shows that his estate has no interest to protect. [5 Litt. Rep. 85; 7 Johns. Ch. Rep. 144.]

9. The statute of limitations did not begin to run until after Dr. Clopton's death, in September in 1836, and could not operate a bar until 1842, more than one year after suit commenced. [1 Ala. Rep. N. S. 650; 2 id. 551.]

COLLIER, C. J.—The first question which presents itself, is, does the bill disclose a case of which a court of equity can take jurisdiction? Upon this point, the material allegations are, that the husband of the complainant, in his lifetime, conveyed to the intestate, Sledge, several slaves, (particularly described,) for the twofold purpose—1st, Of securing to the intestate the sum of seven hundred and twenty-five dollars, which Dr. Clopton owed him for a previous indebtedness and for money then lent; 2d, To cause a settlement to be made on the complainant. The first object being effected, the intestate undertook to convey the slaves to some suitable person *in trust* for the sole and separate use of the

complainant, so that they should not be liable for the debts or contracts of her husband. It is also alleged, that one or two years after the slaves were thus delivered to the intestate, the complainant tendered to him the sum 'for which they were pledged with all interest due thereon, and requested that he would convey the same to trustees for her sole and separate use according to the terms of his agreement. Without denying that he held the slaves in trust, the intestate declined a compliance with her request, saying that she had borrowed the money from a friend, and that he had as well hold them as the friend; and upon being assured that he was mistaken, he then objected to delivering them up, because her husband owed him other debts.

A separate estate to the use of a married woman may be created either before or during coverture; and after marriage, as well by the husband as a stranger. [Clancy on Rights, 251.] But the act by which the husband divests himself of his property must be clear and unequivocal; though it is not always necessary to induce a court of equity to sustain it in favor of the wife, that trustees should be interposed. The powers of that court are competent to effectuate it by the appointment of a trustee, and where no other is designated, will generally treat the husband as such. [Clancy on Rights, 259—260. See also, McLean v. Logland, 5 Ves. Rep. 71; Walter v. Hodge, 2 Swanston's Rep. 97, 109; Shepard v. Shepard, 7 Johns. Ch. Rep. 57.]

In Shepard v. Shepard, [7 Johns. Ch. Rep. 57,] the father conveyed land to his son, on the latter covenanting to pay an annuity to his mother, during her widowhood: held, that she might maintain an action on the covenant for her benefit, and a release of the covenant by the husband in his lifetime, is fraudulent and void as it regards her. The court say, "The relationship between the husband and wife was sufficient to entitle the plaintiff to her action upon the covenant to her husband, and which was made for her benefit. The consideration enured from the husband, and arose from the obligations of that relation, and the release of the son from his covenants, by the father, was fraudulent and void, as respected the plaintiff, who had the sole beneficial interest in the covenants, and who was alone entitled in equity to release them." [See also, Dalton v. Poole, 2 Lev. Rep. 210; Martyn v. Hind, Cowp. Rep. 443; Doug. Rep. 142; Marchington v. Vernon, 1 Bos. & Pul. 101, note a.]

In the case before us, the husband conveys to a third person, who, it is stated, undertook to convey the same property to trus- tees, so as to create a separate estate for the wife whenever she paid him a sum of money which the grantor owed him. Here, the husband has divested himself of the estate in the slaves, and parted with the possession to one, who has engaged to perfect his intentions. The inducement of Dr. Clopton, so far as the bill informs us, thus to provide for the complainant, was certainly sufficient, and the motive in itself commendable. If no settlement had been made on her previously, and the fair inference is, that none had, the husband was but obeying the mere dictate of duty in securing to the wife the small patrimony with which she had been advanced by her father. The contract of Sledge made him a trustee for the complainant, *sub modo*; and he was bound to execute it according to its terms. True, in order to en- title the complainant to claim the benefit of the provision which her husband had made for her, it was necessary that she should pay, or offer to pay the amount for which the slaves were pledged to the intestate. The alternative of this duty, the bill alleges, was performed.

It is unnecessary to determine whether the contract of the husband, so far as he attempted to provide for his wife, was, as it respects himself, a *nudum pactum*. If the law be correctly laid down in the case cited from 7 Johns. Ch. Rep., it would seem that it was not competent for Dr. Clopton to have released Sledge from an execution of the trust; but be this as it may, it is not pretended that a release was attempted. We have seen that the husband may create a separate estate for his wife even during marriage; and his obligation to provide for her, will, as it respects himself, constitute an adequate consideration for such an act. This being the case, the complainant must be regarded as stand- ing in a predicament which entitles her to the favorable conside- ration of a court of chancery. But conceding that the contract between the husband and the intestate, was gratuitous so far as it concerned the wife, and the defendants gain nothing by the concession. It is an unquestionable principle, upon which equity often acts, that where one person receives a conveyance of *any description of property*, upon a verbal agreement, that he will transfer or dispose of it absolutely or conditionally for the bene- fit of another, he is bound to perform his engagement. He is

treated as a trustee, and his refusal to execute the trust considered a fraud. To him, it is wholly unimportant whether there was any consideration of pecuniary value, or founded in moral or social duty, moving from the *cestui que trust*, to induce the act of the grantor. As it respects the trustee, it is quite enough to say, that the grantor has willed it, and you have undertaken to consummate his purpose. [Kennedy's heirs and ex'rs v. Kennedy's heirs, 2 Ala. Rep. 571.] From this view, it results that the bill is not wanting in equity; and, consequently, that the court very properly refused to sustain the demurrer.

This brings us to inquire, whether the case, as stated, is sustained by the proof. Waldigrove Clopton, Mrs. Lees and Mrs. Mitchell all testify that the transaction between Sledge and Dr. Clopton was such as the complainant alleges. The two former say that they heard a part of the writing, executed by Sledge, read, that it provided for the retention of the slaves by him until his debt was paid, then, to use their own language, they were to be *made over* to the complainant. The latter witness harmonizes with them in her statement, but says nothing about the writing. After the writing was executed, and Sledge was about to remove the negroes to his own home, they all affirm that he repeated to the complainant his contract with her husband, just as the two former witnesses had understood it from having heard it read.

It is quite probable that Mrs. Mitchell never heard the contract read, as it is stated by W. Clopton, that she merely passed through the room while it was being executed. This, perhaps, may account for her silence in respect to it. The fact that the pony was conveyed by the deed of trust from Dr. Clopton to Sledge, would not be sufficient to show that another, or even the same, was not embraced by the writing in question. But be this as it may, it does not authorize us to disregard, *in toto*, the testimony of W. C.; it would merely prove that his memory was at fault in one particular, not very essential, and if his evidence stood alone and unsupported, we might accord to it less influence; but sustained as he is by the direct evidence of two witnesses, as to the material points, he must be believed. At most, in the immaterial matter, he is only chargeable with a mistake, to which any one, after a lapse of twelve years, would be subject.

76

The testimony of these witnesses is sustained by all the others whose depositions are taken at the instance of the complainant, with the exception of Wyman; and his evidence, (even if admissible,) proves nothing material for either party. The great difference between the sum for which the slaves were conveyed to Sledge and their true value, is a strong circumstance in connection with others, to show that the sale was not absolute. So the failure to deny the right of the complainant to redeem at the time about which Tarver testifies, is another corroborative circumstance which, if necessary, might be appealed to. Add to all this the evidence of Campbell, that Sledge told him, in 1828 or '29, he had to buy the negroes of Dr. Clopton for the complainant, and it must be admitted, that unless the countervailing evidence overbalances the proof in her favor, the case, so far as it depends upon the facts, is well made out.

The testimony of Harris, whose deposition was taken for the defendants, proves that Dr. Clopton, in 1829 or '30, sold Scilla and her three children, who are named in the bill, to Sledge, with the assent of the complainant—that there was no written or verbal agreement entered into or spoken of, creating a trust or condition. This transaction took place at Dr. Clopton's residence in Montgomery, when no one else was present but the witness, complainant and the parties. Witness left Sledge at Dr. Clopton's house, and on the second day thereafter, the negroes reached the residence of S. in the country. He knew nothing of the sale of Celia, though she accompanied the other slaves to their new home. The testimony of this witness is not at all irreconcileable with the other evidence in the cause, but the fair inference is, that although the terms for the sale of some of the negroes were agreed on, yet the transaction was modified; that Rose and her child were also embraced by it, and instead of being absolute, it was made such as the complainant's witnesses represent it. The witnesses, who make out the case, show, by their evidence, that Harris was not present at the time the contract, of which they speak, was consummated; and as the slaves were removed by Sledge immediately thereafter, it is clear that they depose to a transaction which was perfected after he had left the parties. This view is sustained by the evidence of Campbell, and enforced by the principle which requires that even con-

flicting testimony shall be reconciled as far as practicable, so that witnesses shall receive all due credence.

As the testimony of the complainant's witnesses are not impugned, either directly or by conflicting proof, the relation which the three first, whose testimony is commented on, bears to her, can have no influence upon their credibility; and we are not particularly called on to notice the fact. They are confessedly competent—have made a statement consistent with itself, and according to the course of procedure in equity, it must be regarded as true.

It is argued for the plaintiffs in error, that the witnesses who speak of the execution of a writing by Sledge, heard it read but in part, and cannot, consequently, prove its contents, so as to enable the court to enforce its execution. If it is shown that the intestate had no claim upon the slaves in question, save only to secure the payment of seven hundred and twenty-five dollars; that sum being paid, an objection that it does not appear what ulterior disposition shall be made of them, when urged by his representatives, should receive but little favor. It is true, that the two witnesses who testify as to the writing, do not profess to have heard it all read, yet they speak of it in such a manner as to induee the conclusion that in this they were probably mistaken: they say that it professed to convey to Sledge the negroes as a security for the payment of a certain sum of money due' him, and upon that being paid, they were to be transferred by Sledge to *trustees* for the separate use of the complainant. This is about every thing that one would expect to find in such a writing. Besides the three witnesses who were present when the transaction was consummated, affirm that the intestate stated to the complainant, that such was the contract he had made with her husband.

But conceding that the proof upon this point is not so explicit as could be desired, does it furnish a reason why the intestate's representatives should be protected in the possession of property to which it is clear they have no title? A similar objection was made to setting aside the deed in Kennedy's heirs and ex'rs v. Kennedy's heirs, [2 Ala. Rep. 622.] The court held, that it could not be sustained, though from a defect of proof it might be impossible to execute entirely the intentions of the grantor. "If the law were otherwise, the grantor and his heirs might have ac-

quired an indefeasible estate, without having paid any equivalent therefor." If the intestate was a trustee, with a lien for the payment of a debt, the debt being paid, his representatives have no further claim upon the property except for the purpose of executing the trust; and the details of the settlement raise a question in which the complainant and the distributees of her husband are mainly interested. And the latter, as they are not parties to this litigation, are not concluded by the decree of the court. But we repeat that the proof, so far as the present case is concerned, is sufficient to enable the court to determine, what should be the terms of the settlement.

In respect to the proof of the loss of the writing, we think it entirely satisfactory. After establishing its existence, the witnesses state where they had last seen it, and that it could not be there found, or amongst the papers of those persons to whom its custody would most probably be entrusted.

The evidence of Tarver is quite sufficient to prove a demand of the slaves by the complainant in 1830 or '31, and an avowal of her readiness to pay to Sledge the amount of his lien, as well as the refusal of the latter to relinquish the possession of them.—— This, although not an actual tender, is equivalent to it, as the re-refusal to receive the money made the offer of it unnecessary. The evidence of this witness is strongly sustained by Mrs. Lees.

It is not allowable for the defendants to avoid the execution of the trust, which had been undertaken by Sledge, by setting up the indebtedness of Dr. Clopton. That is a matter with which they should have no concern. If the creditors are willing to acquiesce in the provision which is made for the complainant, no objection can be listened to from any other quarter; and least of all from those, who stand in the predicament of one who has undertaken to be the executor of the debtor's bounty. [Clancy on Rights, &c. 279——280; Curtis v. Price, 12 Ves. Rep. 103.] Conceding that the transaction between Dr. Clopton and Sledge, so far as it relates to the complainant, was voluntary, and intended by her husband to defeat his creditors, yet is it competent for one who has engaged to carry out the husband's intentions, to object to a compliance, because the latter intended to defraud some third person, or such was the legal effect of the thing done? We think not. To entitle the defendants to litigate this question, even if the doctrine of estoppel interposes no barrier, they should show that

they have an interest in defeating the settlement upon the complainant, beyond that of the testator.

But it is said, that the trust should not be enforced, so as to prevent the collection of other debts due Sledge, than those for which the negroes were pledged. This objection is most clearly indefensible. If Dr. Clopton was indebted to the intestate at the time he transferred to him the possession of the slaves, in an amount beyond what it was stipulated they should secure, the undertaking of the latter to settle them upon trustees upon being paid the sum provided for, would be a waiver of all right to subject them for the payment of further liabilities. This waiver might be maintained as a contract; the consideration for which would be, that the slaves had been conveyed for the security of a debt agreed on by the parties; an act which, it may be inferred from the proof, was induced by the intestate's stipulation in favor of the complainant. The refusal to perform such an undertaking would be a fraud on Dr. Clopton and the complainant, and a breach of good faith, which a court of equity cannot favor. [Clancy on Rights, 508–9.]

In respect to liabilities incurred by Dr. Clopton, subsequent to the transaction in question, the trust which was conferred upon the intestate for the benefit of the complainant, would prevent the slaves from being charged with their payment. Where one parts with the possession of property to the donee, it cannot be subjected to the payment of debts afterwards contracted; especially where it is not shown that the gift is intended to defraud subsequent creditors. In the case before us, the pretence for charging the property with such debts, is much less plausible than in the case supposed; for here the creditor was the trustee, had possession of the slaves, and knew that the debtor had parted with all his interest in them.

The act of 1802, "For the limitation of actions," &c., [Clay's Dig. 326–7,] after declaring the time within which actions of *detinue*, trover, &c., shall be commenced, provides as follows: "That if any person or persons, who is, are, or shall be entitled to any of the actions hereinbefore specified, is, are, or shall be, at the time of any such cause of action accruing, within the age of twenty-one years, *feme covert*, or insane, then such person or persons may institute such action, so that the same be instituted within such time as is before limited, after his, her, or their com-

ing to or being of full age, *discovert*. or of sane memory." The case at bar is more like the action of *detinue* than any other form of action at law; and, consequently, if either of our statutes of limitation be applicable, it is the one cited, But the *proviso* of this act declares that it shall not operate against a *feme covert;* and there is, therefore, no pretence for supposing that the statute began to run against the complainant previous to the death of her husband—an event which occurred in September, 1836. The bill was filed in December, 1841, within less than six years after the complainant became discovert; and, consequently, before the statute bar was complete.

The period of limitation prescribed by the statute, not having expired, the complaint cannot be said to be of an origin so stale, that a court of chancery should refuse to recognize and enforce it. If there is a statute applicable to the case, the doctrine of staleness need not be invoked. But conceding that the case is not embraced by the statute; and still we think its antiquity is not such as to authorize its repudiation. During the life of the husband, the wife is subject to his dominion and control, and cannot be expected either to release or assert her rights, unless it be with his advice and, perhaps, co-operation. No presumption, then, can be made embracing the time previous to the death of the husband, that the demand of the wife has been adjusted; but all presumptions must take date from the dissolution of their union by death. This being the case, only five years and three months had expired from the time the complainant became *discovert*—a period quite too short to warrant the rejection of her complaint in consequence of its staleness.

We have already seen that the trust in favor of the complainant attached, *sub modo*, as soon as the slaves were transferred by her husband to Sledge, and that it was only necessary to pay or tender the amount due to the latter, to entitle the complainant to an execution of the trust. The case cited from 7 Johnson's Chancery Reports, if authority to the point were necessary, very satisfactorily shows that the complainant may sue.

The decree, in its details, has not been questioned, and seems to us to be most equitable, it therefore results that it must be affirmed, with costs.