## MICHAN AND WIFE *vs.* WYATT.

1. When a bill is filed in the name of husband and wife, respecting the wife's separate estate, and at the hearing the wife moves the court for leave to amend the bill, by making her husband a defendant, and inserting the name of some responsible person as next friend, the action of the Chancellor upon the motion is discretionary, and his refusal to grant it not revisable on error.

2. To authorize the dismissal of a bill on final hearing on account of the misjoinder of complainants, the misjoinder must be of complainants whose interests are so diverse that the Chancellor cannot include them in one decree, or, at least, must differ so widely as materially to affect the propriety of the decree.

3. Where a bill is in form the bill of husband and wife, yet, in substance and fact, it only concerns the separate estate of the wife, and seeks only to establish her rights and protect her interests, and asks no relief for or against the husband, he will be regarded as her next friend or trustee, and the decree rendered will be conclusive on the wife.

4. But if the bill seeks relief either for or against the husband, the Chancellor should order it to stand over, until it can be reconstructed, so as to make the husband a defendant, and interpose a next friend to prosecute for the wife; and this, whether the objection be made by demurrer, plea, answer or for the first time at the hearing; but in the last case, it is left to the sound discretion of the Chancellor, whether he will allow it, or dismiss the bill without prejudice to the wife.

5. A transcript of the record of a judgment against the husband, is not admissible evidence against the wife under a bill filed, in the name of the husband and wife, concerning her separate estate.

6. The statutes of this State requiring the registration of certain conveyances which create incumbrances on the title, do not include a deed of gift, executed in another State, by which slaves are given to a married woman, "during her natural life, to her separate, sole and exclusive use and behoof," and at her death to her children. Such a deed is not an incumbrance on the title, but the evidence of the title itself; and the possession of the husband and wife under it will be referred to the title, and the husband will be considered the trustee for the wife.

7. The statute of limitations does not bar a married woman from recovering her separate property, sold under execution against her husband, when her title accrued during coverture.

ERROR to the Chancery Court of Perry.

Heard before the Hon. W. W. MASON.

The bill in this case was filed by John Michan and wife against William N. Wyatt. It alleges, that, on the 4th of October, 1819, Nancy Renwick, the mother of Leah Michan, who then resided in the State of South Carolina, was possessed in her own right of three slaves, named Sarah, and her children, Spencer and Young; that on that day she conveyed said slaves to Mrs. Michan by way of loan for her life, for her sole and exclusive use and benefit, and at her death to her children in equal portions; that Mrs. Michan was then a *feme covert*, living with her husband, John Michan, in the State of South Carolina, and that the slaves were delivered into her possession; that since said loan and delivery, she, with her husband, has removed to Alabama, and brought the slaves with them; that the object and intention of Nancy Renwick in making the deed for the slaves in the terms in which it is made, was, to create a separate estate in said Leah, free from the control and interference of the husband, or any other person whatever, and to protect her in the sole and exclusive use of said slaves; that the woman Sarah had other children, to-wit: Ann (who has two children, Richard and an infant,) and Dick, together with others which are not named in the bill; that in the month of January, 1843, one Thomas R. Williams of Benton county, and one James H. Michan, son of complainant, obtained possession of the slaves Young, Dick and Ann, also the children of Ann then in being, against the consent and will of Leah Michan, and carried them away from the county of Randolph, where they then were, in the employment of said Leah and her husband, to the county of Perry, where said Williams sold said slaves to William N. Wyatt, who still has them in his possession, and claims them as his own; that he refuses to deliver them to Leah Michan, the complainant, although they have been demanded of him. The bill then sets out the value of the slaves; that they are family slaves, to which complainant Leah is greatly attached,

she having raised most of them in her dwelling house with her own children; that the slaves are greatly attached to her, and their value in money would be no adequate compensation to her for their loss. The bill prays for a restitution of the slaves, and an account for their hire since they have been in possession of the defendant. It is also prayed, that a trustee be appointed; and for general relief. The deed exhibited with the bill is in these words:

"The State of South Carolina, Newberry District: Know all men by these presents, that I, Nancy Renwick, of the State and District aforesaid, for and in consideration of the natural love and affection which I have for my daughter, Leah Michan, of the District and State aforesaid, have freely and voluntarily lent, and by these presents do hereby lend unto my said daughter, Leah Michan, a negro woman named Sarah, and all her future increase, and also her two children, Spencer, about two years old, and Young, about nine months old, which said three negroes, and the future increase of the said Sarah, I lend to the said Leah Michan during her natural life, to her separate, sole and exclusive use and behoof; and after her death, I give and grant the said negroes, and the future increase of the said Sarah, to the children lawfully begotten of the said Leah, share and share alike, as tenants in common, without any right of survivorship. In witness whereof, I have hereunto set my hand and seal, this 4th day of October, A. D. 1819.

In the presence of        NANCY RENWICK, [Seal]"
    JOHN BANSKETT."

Wyatt answers, that he knows nothing of the deed under which Leah Michan sets up her claim to said slaves, and calls for proof of its existence and terms; that if it does in fact exist, it has never been recorded; that he is a purchaser for valuable consideration; that said slaves were bought by one Williams at sheriff's sale, under execution on a judgment against John Michan, and sold by Williams to him; that he inquired of one Goree, to whose house the slaves had been sent by the complainant, as to the title, who told him it was good; that Leah Michan knew of the sale by the sheriff, was present at it, by her agent, James H. Michan, and suffered the slaves to be sold, without in any manner making known her

claim; that more than six years intervened between the sheriff's sale and the filing of the bill. He insists on the lapse of time as a bar to the suit, and demurs for want of equity, and misjoinder of complainants.

. The demurrer was overruled by the Chancellor.

At the hearing, Leah Michan moved the court for leave to strike the name of John Michan from the bill, and to make him a defendant; and also for the privilege of inserting in the bill, the name of some person as next friend. This motion was disallowed, and a hearing was had on the bill, answer and proof.

The proof is substantially this: B. L. Goodman proved the genuineness of the hand-writing of John Banskett, the subscribing witness to the deed for the slaves made by Nancy Renwick to Leah Michan, mentioned in the bill, and attached to it as an exhibit. He also proved that said subscribing witness resides in Edgefield District, South Carolina.

Nathan Renwick testifies, that he is the brother of Leah Michan; that the complainants are husband and wife; that Leah Michan has had possession of the slaves named in the deed from Nancy Renwick since 1819—a part of the time in South Carolina, a part in Georgia, and then in Alabama;—that the slaves, Young, Dick and Ann, now in controversy in this suit, are the children of the girl Sarah mentioned in the deed, and were in possession of the defendant on the 31st of May and 1st of June, 1849; that Banskett, the subscribing witness to the deed of Mrs. Renwick, resides in the State of South Carolina.

William H. Anderson testifies, that complainants are husband and wife; he proves also the color and age of the slaves, the possession in Georgia and Alabama by Leah Michan; that they are family slaves; that Mrs. Michan's possession continued up to 1842; that complainants knew when the slaves were taken out of their possession; has heard John Michan say, that the slaves were taken from his residence to prevent their being sold for the payment of his debts; he never heard Leah Michan say the same; he is not certain, but thinks he heard complainants say, the negroes were about to be sold under an execution against John Michan; heard them speak of the sale after it had taken place; heard them say, the ne-

groes had sold for more than enough to pay the execution, and heard John Michan say he had sent for the balance.

John Long testifies, that he had seen the slaves mentioned in the bill in the possession of John Michan, in Georgia and Alabama, some of them for twenty years; that he and James Michan, the son of complainants, took the negroes, Ann and her child Dick, and the boy Young, to Perry county, and left them with Goree in the town of Marion; that James Michan asked him to aid him to take the slaves from Randolph county; that the negroes were taken from the gold mines, and not from the residence of John Michan, which, at the time, was in Cherokee county, about sixty or seventy miles from the mines; that neither John nor Leah Michan ever said any thing to him on the subject until after witness returned from Perry county, and not then until witness told John Michan where and with whom the slaves had been left; when John Michan replied, it was all right. He does not know whether Leah Michan was present and heard this conversation or not; he has never heard her say any thing about it; he had hired these slaves before taken to Perry county, and settled with John Michan for their hire; John Michan managed them, and Leah Michan exercised over them only such control as wives ordinarily do over the slaves of their husbands; he does not know for what reason the slaves were taken to Perry county, but has heard that it was to prevent them from being levied on for a debt on which John Michan was security.

Wm. Michan testifies, that the slaves in controversy, which were bought by defendant, were reputed to be the children and grandchildren of the girl Sarah; that from witness' earliest recollection they were in possession of John and Leah Michan, (his parents,) but claimed by Leah as her separate estate; that, in 1842, they were sent to Perry county, to be hired out; James H. Michan took them there, and was Leah Michan's agent for that purpose; the hire was to be used for the support of the family; the slaves were raised by complainants, and treated as their own children; they were easily governed, and their characters and dispositions were good; there were executions against John Michan, but witness does not know whether the slaves were removed on that account;

heard his mother say that the negroes should not be sold; Leah Michan knew when the slaves were taken to Perry county, and in whose possession they were there left, and was satisfied with the arrangement.

John Hartsfield testifies, that he knew the complainants as husband and wife; knew the slaves from 1828 to 1838; they were family slaves; John Michan, as head of the family, managed them, and Leah Michan acted towards them as other wives do towards their husbands' slaves; never heard her say they belonged to her husband.

Blueford Gross proves substantially the same facts that were proved by Hartsfield. This, with the deed from Mrs. Renwick, and a transcript from the Court of General Sessions and Common Pleas for Newberry District, South Carolina, showing the deed to have been duly recorded in the clerk's office of that court on the 7th October, 1819, was all the testimony introduced by complainants.

Tabitha Cox testifies, that she resided within a half mile of the complainants when they lived in Cherokee county, Alabama; was intimate with them, and was visited by Mrs. Michan; that Mrs. Michan told witness, a few days after the slaves were taken away in 1842, that her husband and some other persons had held a conversation the night on which the negroes were sent away, and had resolved to send them off; that she, Mrs. Michan, made preparations for their start, and they were taken away in the night, and that Long and Jas. H. Michan had carried Ann and her child to Newberry District, South Carolina.

Littleton Long testifies, that the slaves were in possession of complainants until 1841 and 1842; in the latter year, there being executions in the hands of the sheriff of Cherokee county against John Michan, witness went to his house, and told Leah Michan that such was the case, and gave it as his opinion that the sheriff intended to levy them on Ann and her child, who were the slaves then in possession of complainants; on the night of this day the slaves were sent away by James H. Michan, a favorite son of complainants; he afterwards learned from them that they had been taken to Perry county, and hired to one Goree. The slaves were in the possession of John Michan and his wife while witness

knew them, and he never heard Leah Michan claim them as her separate property.

John Long, when examined by defendant, proves substantially what he testified when examined by complainants, with this addition, that he had known complainants for fifteen or twenty years, and never heard Leah Michan claim the slaves as her separate property until, after they had been taken by himself and James H. Michan to Perry county.

M. E. Gary testifies, that he levied an execution in favor of one Crawford v. John Michan, in the county of Sumter, on three slaves, and sold them, no person forbidding the sale; he does not remember the names of the slaves, or who bought them; they sold for more than enough to satisfy the execution, and he paid the balance to one Isaac E. Payne, on an order in favor of said Payne, drawn by John Michan. The order spoken of and the receipt of Payne are attached to his deposition. The former is drawn by John Michan, and attested by Mordica Brown, J. P., and simply requests Gary to pay Payne the surplus on the sale of the slaves.

A transcript of the record in the case of Crawford v. Michan, is next found in the record, which shows the judgment, execution, and return of Gary, by which it appears that one Thomas R. Williams was the purchaser of the negro slaves Dick, Ann and Young, at the sheriff's sale in Sumter. This return is dated January 3, 1843. Accompanying this return is found a paper in the following words: "The State of Alabama, Sumter county: I do hereby release Matthew E. Gary, sheriff of said county of Sumter, from all liability he has incurred, or may incur, by reason of his levying upon and selling by this execution, as the property of John Michan, the certain slaves named Dick, Young and Ann, and waive all suits against him. Given under my hand and seal, this 2nd day of January, 1843.    JAMES H. MICHAN, [seal.]"

Joseph L. Long testifies, that he has known complainants sixteen or seventeen years; knows the slaves in controversy; heard Leah Michan, in 1842 or 1843, say they were at Goree's in Greene or Perry county; she expressed her uneasiness lest her husband's creditors should find them, and sell them for his debts; she directed her son Joseph H. Michan, and one Simms, to go and remove them, but to what place wit-

ness does not remember; John Michan was about the house when this conversation took place, but witness does not know that he heard it; Leah Michan told her son and Simms to hurry and remove the slaves.

Langston Goree proves, that James H. Michan and John Long, in the Spring of 1842, brought the slaves Dick, Young and Ann, (with an infant child of Ann's, which died shortly after he received them,) to his house; that they delivered him a letter (now lost) from John Michan, stating that the slaves had been sent to him to prevent their being levied on and sold for his debts; that he desired the witness to take them under his management, until the danger was past; witness received and kept them until October of that year, when he delivered them to one Simms, who took them, by direction of witness, to one Ashford's in Sumter county; he saw no more of them until he saw them in possession of Thomas R. Williams, who sold them to defendant; when defendant was about to purchase, he inquired of witness about the title to the slaves; witness told him he thought it was good, and if he had the money he would purchase them himself; defendant then bought them; witness knew complainants in South Carolina, never heard Leah Michan claim said slaves as her separate estate, or even intimate such a claim.

Isaac E. Payne testifies, that, after the sale of the slaves by the sheriff of Sumter, John Michan gave him an order to said sheriff for an overplus of funds in his hands; he got the money on the order, retained a part which John Michan owed him, and paid the remainder to a garnishment in favor of one of John Michan's creditors; Leah Michan did not sign the order, but was present when it was first spoken of, and said they would like to get the money, if it would not prejudice her right in a suit she had then brought, or was about to bring, for the slaves.

The defendant purchased the slaves from Williams, on the 27th day of January, 1843, and the bill in this case was filed on the 19th day of January, 1849.

On the hearing, the complainants objected to the reading of the transcript of the record from Cherokee county, in the case of Crawford v. John Michan; but the objection was overruled by the court. The Chancellor dismissed the bill.

Michan and Wife v. Wyatt.

The errors assigned are:

1. The court erred in dismissing complainants' bill, at the costs of complainants;

2. The court erred in the final decree rendered;

3. The court erred in dismissing the bill, and refusing the relief sought by it;

4. The court erred in overruling complainants' motion to strike out the name of John Michan as complainant, and to make him a defendant, and to insert the name of some person as *prochein amy* of Leah Michan;

5. The court erred in not decreeing relief to Leah Michan, and in not appointing a trustee for her.

BELSER & RICE, for plaintiffs in error:

1. This suit is brought in relation to the wife's separate property. The husband is joined as plaintiff, merely because the forms of law do not permit a married woman to sue in her own name alone. He has no interest in the subject-matter of the suit, and claims none; and no relief is sought by or against him. The wife having no trustee, the law makes the relation of the husband to the suit, that of her next friend. Such a suit is the suit of the wife. Trustee and *cestui que trust* may join as plaintiffs; and there is no misjoinder of complainants in this suit. Boykin v. Ciples, 2 Hill's Ch. R. 200; Berry v. Tibbats, 11 B. Monroe, 256; Wilson v. Wilson, 6 Ired. Eq. 236; State v. Reigart, 1 Gill's R. 29; Kenny v. Udall, 5 Johns. Ch. 473; Bein v. Heath, 6 How. U. S. R. 239.

2. The modern English practice, alluded to in Bein v. Heath, *supra*, which seems to be followed in New York, rests upon one reason only, viz: that the decree, if adverse to the wife's claim, will not bar her from a subsequent suit, in her own name, by her next friend, for the same matter. The utmost benefit that the defendant can derive from an objection to the form of such a suit, is, to have the suit put in proper form to make it conclusive on the wife; which the court will do at any time, even at the hearing. But when the complainant makes the motion, at the hearing, to put the suit in proper form, by making the amendments proposed in this case, and the defendant himself objects to the motion,

and thus prevents the correction, it is a waiver on his part of his previous objection by demurrer, for the alleged misjoinder of husband and wife; the objection itself is to a mere matter of form. The Chancellor was mistaken, in supposing that he could not grant the amendment at the hearing, against the defendant's objection. Stuart & wife v. Kissam, 2 Barb. S. C. R. 493; McLane v. Riddle, 19 Ala. 180. The modern English practice ought not to be adopted here, since the passage of the act of 1848, which makes the husband a trustee for the wife. Key v. Vaughan, 15 Ala. 497.

3. The Chancellor overruled the demurrer for misjoinder of complainants; and, therefore, that objection cannot be urged here to sustain his decree, dismissing the bill on another ground. Grimshaw v. Walker, 12 Ala. 101; Gibbs v. Frost, 4 ib. 730.

4. The separate estate of a married woman is not liable to be sold under execution at law, during coverture, either for her own or her husband's debts. Haygood v. Harris, 10 Ala. 291. "And the only ground on which it can be reached in equity, is that of appointment; that is, some act of hers, after marriage, indicating an intention to charge the property." 1 Comstock's R. 452.

5. The relation of the husband to such a suit as this being that of a next friend of his wife, his acts and declarations, in respect to the matters in litigation, are not evidence in the suit, nor binding on the wife. Stuart v. Kissam, 2 Barb. S. C. R. 493; Roden v. Murphy, 10 Ala. 804; 8 B. Monroe, 32.

6. If this suit is not regarded as the suit of the wife, it must be because the decree, although adverse to her rights, is not conclusive on her. But the decree here treats the suit as the suit of the wife, and decides that her right has been lost; if permitted to stand, it is conclusive on her, and would bar any subsequent suit by her next friend. 6 Howard's R. 239, *supra*.

7. The statute of limitations has no application to such a case as this. It is a suit by a married woman, in relation to her separate estate in slaves of which she has been deprived during coverture. Her coverture existed when the separate estate was created, when she was deprived of the slaves, and still exists. No trustee has ever been appointed for her; she

could not have sued at law. Even if an action at law could have been sustained, to enforce the right which she asserts in this bill, still, the statute could not affect her right, because she is within the express terms of the proviso. Clay's Dig. 327, § 80. Even where the subject-matter of the suit is embraced by the statute, the right of a *feme covert* would not be barred or affected by it, when it is shown that she was under the disability of coverture when her right accrued, and has been so ever since. The statute does not begin to run until the coverture ceases, as to rights and causes of action accruing during coverture. Curll v. Compton, 14 Sm. & M. 56.

8. There is nothing in the idea that the wife is estopped. To maintain equitable estoppel, the defendant must be able to show that he has been injured by the deceptive and fraudulent conduct of the wife. 11 Humph. 435. · Mrs. Michan did nothing, and said nothing, which influenced the purchase, either of Williams or Wyatt. The defendant swears, in his answer, that he never heard of her claim until after his purchase. The surplus proceeds of the sale were paid over to Payne, on the order of John Michan, long after the defendant's purchase. Mrs. Michan gave no authority to Payne, and received none of the money. Payne proves her unwillingness to have her husband draw the money, if it would in any way affect her rights. She has done nothing to confirm the sale, and is clearly not estopped. Johnson v. Johnson, 5 Ala. 90; McLane v. Spence, 11 ib. 172; Finn & Dulany v. Barclay, 15 Ala. 626; Pounds v. Richards et al., June term, 1852; 17 Conn. 361; 11 Humph. 435.

8. The deed creating the separate estate was executed in South Carolina, and no record of it was necessary. Lyde v. Taylor, 17 Ala. 270.

A. B. MOORE, *contra:*

I. The demurrer to the bill should have been sustained :

1. Because there is a misjoinder of parties complainant, in connecting John Michan with his wife, in a suit for her separate property. If made a party at all, he must be a defendant. Dan. Chan. Prac. 142, 143, 144; 16 Ala. 87; 17 ib. 631; 4 Bouv. Inst. 295.

2. She should have sued by her next friend. See authorities, *supra.* ´

3. John Michan has no interest as plaintiff in the suit; he is entitled to no relief, of course, as an improper party. 1 Dan. Chan. Prac. 347, 350; Story's Eq. Pl. §§ 508, 318, 260, 261; Bowie v. Minter, 2 Ala. 406; 6 ib. 303; 9 ib. 351; 14 ib. 135.

4. The bill could not be amended, after the trial had proceeded for some time, in the manner proposed. If Mrs. Michan had sued alone, her bill would have been dismissed. If she improperly joined her husband, the same consequences must follow.

5. The practice permits some amendments, at this, or even a later stage of the case, as by adding parties in a creditor's bill; but it does not allow such an amendment as was proposed in this case, at the time proposed.

6. There is no equity in the bill, as complainant had a remedy at law, by action of detinue or trover. Hardeman v. Sims, 3 Ala. 747; Colburn v. Broughton, 9 ib. 351.

7. The allegations of the bill are not sufficient to give jurisdiction to a court of equity.

8. Equity follows the law, in regard to the statute of limitations; and as complainants' remedy at law is barred, it is also barred in equity. 2 Story's Equity, § 1520, note 2. More than six years had elapsed between the time of sale, January 2, 1843, and the time when the bill was filed, January, 19, 1849.

9. The reservation in the statute, in favor of *femes covert*, does not extend to a case of this kind. So far as these slaves were concerned, Mrs. Michan was a *feme sole*. The right of action which accrued to her on the sale of the slaves, was as perfect then, as it was when this suit was commenced. The proviso of the statute was only intended to reach those cases where the wife could not sue without joining her husband.

10. The defendant being an innocent purchaser, without notice, for a full consideration, and that paid, he will be protected by the statute of limitations, even if the property had been taken secretly, and fraudulently, and without her consent. Howell v. Hair, 15 Ala., 194; 1 Howard's U. S. R., 189. But in this case they were taken neither secretly nor fraudulently. She aided in sending them off; knew where they were all the time; knew that they were levied upon,

and were about to be sold ; knew that they were sold, and to whom, her agent being present at the sale.

II. Upon the merits of the case, the superior equity is with the defendant:

1. Because he is an innocent purchaser, without notice. 2 Story's Equity, §§ 1502, 1503 ; 2 Vesey, 457; 1 Sumner, 507.

2. Because Mrs. Michan concealed her deed, and. voluntarily aided in putting the property out of her possession; she was perfectly cognizant of all the facts attending the levy and sale, and yet did not make known to any one that she had a deed or claim of any kind. She was careful not to make it known, until after the sale had taken place, her husband's debts been paid, and the surplus of the proceeds drawn from the sheriff's hands by her consent. Upon this state of facts, this court will not come to her relief, to the prejudice of an innocent purchaser. Baker v. Rowan, 2 Stew. & P., 372 ; 1 Story's Equity, § 385; 7 Ala., 906; 1 Johns. Chan., 353; 6 Howard's U. S. R., 228; 6 Johns. Chan., 167 ; 8 B. Monroe, 547 ; Sugden on Vendors, 299.

3. The testimony of Goree shows, that Wyatt was not a mere speculator, a heedless purchaser ; that he made diligent inquiry about the title, and was told by Goree that it was good, and that he would himself purchase if he had the money. He used due caution, and paid a full consideration.

4. It is manifest from the whole case, that Mrs. Michan has been guilty either of a fraudulent concealment of her deed, or of gross and culpable negligence; and in either case she will not be protected, at the expense of one who has been injured by her fraud or negligence. 2 Stew. & P., 372 ; Morris v. Moore & Hancock, 11 Humph., 434; Storrs v. Baker, 6 Johns., Ch., 167.

5. The drawing of the balance of the money from the hands of the sheriff by Mrs. Michan's consent, was a ratification of the sale, or at least shows her fraudulent intent in letting the negroes be sold, for the purpose of paying the husband's debts, getting the balance of the money, and then suing for the property.

LIGON, J.—The Chancellor having overruled the demurrer, and no cross assignment of error being found in the

53

record, the case must be here considered as though no demurrer had ever been interposed.

The case, then, is this: John Michan and wife file their bill against the defendant, for the recovery of property to which the wife alone is entitled, as her separate estate. Neither the allegations nor prayer assert a right in, or seek relief for the husband, in respect to the subject matter in controversy. The wife's interest alone is propounded, and the relief sought is for her protection and benefit. The answer denies her right, and that of her husband, to the slaves in controversy, as well as the right of either to the relief sought.

The proof shows, that the slaves were loaned by deed to the wife for life, to her sole and separate use, and at her death they were to vest in her children; that the slaves went into the possession of the wife, she being a *feme covert* at the time, and continued in the possession of husband and wife for more than twenty years, when they were levied on and sold as the property of the husband, and were purchased by one Williams, who sold them to the defendant for a valuable consideration.

At the hearing, the wife moved the court for leave to amend her bill, by striking out the name of the husband as complainant, and inserting that of some responsible person as next friend, and to make the husband a defendant. This motion was disallowed by the court.

The rule is, that a bill filed by husband and wife is generally to be taken as the bill of the husband. 1 Danl. Ch. Pr. and Pl., 350; 17 Ala., 201; 5 Paige, 581. But if the bill shows, on its face, that it is filed in respect alone to the wife's separate estate, and the defendant suffers the case to go on to final hearing, without taking exception to it, by demurrer for misjoinder of complainants, or by way of plea in his answer, he can then claim no advantage from it as a matter of right. On this subject Mr. Justice Story very justly remarks: " It is not safe, in any case, to rely on the mere misjoinder of parties as an objection at the hearing; for if the court can make a decree at the hearing, which will do entire justice to all the parties, and not prejudice their rights, notwithstanding the misjoinder, it will not then allow the objection to prevail." Story's Eq. Pl., § 237.

The rule which allows bills of this kind to be altered in their form and structure at the hearing, or on demurrer, is intended for the protection of the defendant; and its aid, in all the cases which I have examined, has been invoked by him. For if the bill is so constructed as to show that the husband claims an interest in the thing in controversy, and it turns out that he has none, but that the controversy concerns only the separate estate of the wife, a decree on such a bill, although it be for the defendant, will not conclude the wife, or offer the slightest impediment to her assertion of her rights by her next friend. I can see no reason, however, which will prevent the wife in such cases, if she apply in time, from asking for leave to amend her bill, so as to be able to present her case to the court fully and fairly, under the rules of practice, so that she too may be enabled to have her rights passed upon, and, (if she be entitled to it,) the relief she seeks granted to her. Yet her application for this purpose, when made at the hearing, must be subjected to the same rules, so far as they relate to the discretion of the Chancellor, that would govern it if made by the defendant.

All the authorities, so far as I have had opportunity of examining them, agree, that it is at the discretion of the Chancellor, when leave thus to amend the pleadings is asked for the first time at the hearing, to grant or refuse it. This being the case, his action on such a motion is not revisable on error. Story's Eq. Pl., § 63, and notes; 1 Danl. Ch. Pr. and Pl., 350; Bowie v. Minter, 2 Ala., 406; Boykin v. Ciples, 2 Hill's Ch. Rep., (S. C.,) 200; Kenny v. Udall, 5 Johns. Ch. Rep., 473; 2 Barb. Sup. Ct. Rep., 493; Bein v. Heath, 6 How. U. S. Rep., 239.

These authorities show conclusively, that, whether in this instance the refusal of the Chancellor to allow the amendment moved for by the complainant, Leah Michan, was a proper exercise of the discretion given by the law, or not, his action in this respect cannot be revised on writ of error.

But the question arises, was there such a misjoinder of parties complainant in this case, as to authorize a dismissal of the bill, on a final hearing, for that cause alone. It is well settled, that the misjoinder which will authorize this course must be of complainants whose interests are so diverse that

the Chancellor cannot include them in one decree, or, at least, must differ so widely as materially to affect the propriety of the decree.

Is this the case here? John Michan, the husband, sets up no claim in the bill, either to the slaves or their hire. He asserts only his wife's title, and exhibits with the bill itself a deed, as the evidence of that title, which, on its face, shows the slaves to be the separate estate of the wife, and expressly negatives any right in him whatever. The prayer of the bill, too, forbids the conclusion that it is filed to assert an interest in the husband; for it seeks only the restoration of the slaves to the possession of the wife, an account of hire for the time they have been adversely held, and the appointment of a trustee to hold and manage the slaves for her. Had the bill been filed by the wife, through her next friend, its allegations and prayer must have been the same, without addition or diminution. It is not then, in any proper sense of that term, the bill of the husband. Neither does it seek to divest him of any right, or deprive him of any interest, which renders it indispensable to make him a defendant. Nor is his position as complainant at all inconsistent with his rights and duties in another capacity, in which the law regards him as acting in respect to these slaves, which are clearly shown to be her separate property by the deed from her mother to Mrs. Michan. It is a well settled rule, that, where a deed creates a separate estate in the wife, and appoints no trustee to hold for her, and none has been appointed by a court of competent authority, the husband is the trustee, and in this capacity may protect, and, indeed, by every principle of legal and moral duty, is bound to protect the separate property of the wife, against wrongs and injuries from strangers. He would be recreant to every duty which the law imposes on him as trustee, if, when it was wrongfully or illegally taken away from his possession by a stranger, he did not use all legal means to recover and restore it. The deed in this case appoints no trustee, nor does it appear that one has been appointed by any competent authority. John Michan then, in this proceeding, may be regarded as the trustee for his wife, and in this capacity he has a standing with her in a court of chancery.

This is no new view of the rights of parties situated as these are; and it is so consistent with our views of the rights and duties springing out of the relations existing between them, that we willingly adopt it.

As early as 1752, the Lord Chancellor (Hardwicke) in the case of Griffith v. Hood, 2 Ves. Sr., 451, said: "Where there is any thing for the separate use of a wife, a bill ought to be brought by her *prochein amy* for her; otherwise it is her husband's bill. However, there have been cases of such a bill by the husband and wife, and the court has taken care of the wife, and ordered payment to some person for her;" and he retained the bill in that case.

In Boykin & wife v. Ciples et al., 2 Hill's Ch. Rep., (S. C.) 200, the facts were substantially these. One John Adamson, the father of Mrs. Boykin, Mrs. Ciples and Mrs. Delesseline, made his will, by which he gave to each of his daughters twenty-six slaves "during their natural lives, alone, and to their sole and separate use, without being in any manner subject to the debts, contracts, or forfeitures of their husbands, and to the heirs of their respective bodies, who may be living at their respective deaths. In case either of my daughters should die without leaving heirs of her body, her share shall go to the other or others of them, subject to the same terms and limitations as her or their bank shares." The bank shares were, in the event of a failure of issue with all the daughters, limited to certain grandsons named in the will. After the death of the testator, the husbands of the three ladies, in order to cut off the limitation in favor of their several wives and children in the portion of the sister or sisters who might die without issue, executed releases to each other; and in consideration that each had so released to the other, and for the further consideration of one dollar, each covenanted with the other, that neither themselves, their wives, nor the issue of their wives begotten by them, should ever set up any claim to the portion of the sister so dying without issue.

Mrs. Delesseline died without issue, and Boykin and wife filed their bill for the portion of the legacy of Mrs. Delesseline to which Mrs. Boykin was entitled, by the terms of her father's will, and claimed it as the separate estate of Mrs. B. Ciples and wife and Delesseline were made defendants, and

set up the release made by Boykin in bar of the suit. The Chancellor disregarded the form of the bill, disallowed the release as a defence against the wife's claim, and decreed partition. The case was taken to the Court of Appeals. Harper, J. in delivering the opinion of that court, said: " The only question necessary to be considered is, whether a married woman may sustain a suit for her separate property, her husband being joined in the bill. If she may, she certainly cannot be estopped by her husband's deed made in his individual capacity. When property is settled to the separate use of a married woman, and no trustee is appointed, it is a known rule of the court that the husband shall be made a trustee. Being a trustee, it should seem that he was a necessary party to the suit for the trust property, and being liable for costs, that any other *prochein amy* was unnecessary." And after citing Pawlett v. Delaval, 2 Vesey Sr., 663, in which Lord Hardwicke said, "if a bill be brought by husband and wife, for the wife's property, it is the bill of the husband," he justly remarks, that, "in that case, for aught that appears, the suit was for the benefit of the husband;" he cites Griffith v. Hood, *supra*, in which it is said, the decree must be for the wife, and a trustee appointed, and proceeds: "This is, I suppose, what we are bound to do if the bill be sustained. A husband, from necessity, is construed to be the trustee of his wife, but he is not the proper trustee. In general, the office of a trustee is to protect the property against the husband." The decree of the Chancellor was affirmed, and a trustee was appointed.

In Stuart v. Kissam, 2 Barb. Sup. Ct. Rep., 492, the bill was in the name of the husband and wife, against the trustee of the wife, to make him account with respect to the management of the wife's separate estate. It was objected at the hearing, that there was a misjoinder of parties; and it was attempted to be shown by proof, that the husband had made admissions and done acts with regard to the subject matter of the suit, which would bar a recovery on his part. The objection to the form of the bill was disallowed; and as it was a matter resting in the sound discretion of the Chancellor, the Supreme Court refused to review its exercise, retained the case as the suit of the wife, rejected the testimony offered to

prove the declarations and acts of the husband, injurious to the rights and interests of the wife, and proceeded to decree in her favor.

In considering the position which the husband sustained to the suit, the court say: "The husband is merely a formal party. He has no interest in the subject matter of the suit, and claims none; no relief is sought by, or can be decreed to him. He is joined plaintiff in this case, because the forms of our law do not permit a married woman to institute a suit in her own name, alone. Either her husband must join, or she must sue by her next friend. Where the suit relates to the wife's separate estate, in which the husband has no interest, and he is joned as plaintiff, his relation to the suit is very similar, if not precisely analogous, to that of a next friend. The whole subject matter of this suit belongs to the wife. She complains that her trustee has dealt improperly with her property. It is no answer for him to say, that her husband, who has no interest in such property, no right to interfere with it any way, no power to bind or affect her interests in respect to it, consented to the breach of trust."

To the same effect is the case of Berry v. Williamson and wife et al., 11 B. Monroe, 245, and Bein et al. v. Heath, 6 How. U. S. Rep., 228. In the latter case, the form of the bill is identical with the one we are now considering, and sought to set aside a mortgage made by the wife, in which her separate estate was charged with the payment of a debt originally contracted by the husband, but as a security for which the wife had made her own notes and a mortgage on her separate estate. The bill sought no relief for the husband, and contained no allegation except such as were necessary to propound the interest of the wife. The Supreme Court of the United States say, in the opinion: "It is objected, that, the suit being brought in the name of husband and wife, it must be considered as the suit of the husband, and that a decree will not bind the wife.

On looking into the bill it appears, that the name of the husband is used only as the *prochein amy* of the wife. He asks no relief. The wife prays an injunction against the sale of the mortgage property, and a rescission of the mortgage and notes, and a release from all liability."

To these cases, if it were necessary, others could be added, but I deem it unnecessary. They are sufficient to establish the rule, that, where the bill is, in form, the bill of husband and wife, yet, in substance and in fact, it only concerns the separate property of the wife, and seeks alone to establish her rights, and protect her interests, without seeking relief against the husband, he will be regarded only as her next friend or trustee, and a decree rendered in it will be conclusive on the wife. But if the bill seeks relief, either for or against the husband, the Chancellor should order it to stand over, until it could be reconstructed, so as to interpose a next friend to prosecute for the wife, and make the husband a defendant; and this, whether the objection be made by demurrer, plea, answer, or for the first time at the hearing; but in the latter case, it is left to the sound discretion of the Chancellor whether he will allow it to be done, or dismiss the bill without prejudice to the wife. In this view of the case, it was proper for the Chancellor to dispose of the case upon its merits, and under the assignment of errors, it becomes our duty to pronounce whether he erred in the decree rendered by him.

Before, however, I proceed to this, it may be well to remark, that there is no conflict between the ruling in this case and in that of Hamilton and wife v. Clemens, 17 A. R. 201, although there is a seeming one. I well remember the facts of that case, having decided it in the court below. They are wholly dissimilar from those of this case. In that case, the bill was filed for the purpose of asserting a resulting trust in favor of Mrs. Hamilton, in certain slaves held by the defendant, and the court was asked to declare and establish it for the benefit of both husband and wife. It was not pretended that this trust had been created for the sole and separate use of the wife. The husband sought a personal benefit by the bill, and joined with the wife in its allegations and prayer. It sought relief for him, deducing his claim through his wife. A release of his interest in the property sought to be recovered, made before the filing of the bill, and apparently on a good consideration, was pleaded by the defendant; and the bill was dismissed, but without prejudice to the rights of the wife. Here, the husband, as has been before remarked, as-

serts no interest in himself, seeks no benefit, and asks no re-
lief. He is a mere nominal party, standing here because the
wife's rights have been invaded, and by the rules and policy
of our law, she cannot sue alone, and he, from necessity, is
her trustee. In that case, it was in form and substance the
bill of the husband; in this, it is substantially the bill of the
wife.

On the hearing, a transcript of the record of the proceed-
ings, judgment and execution in the Circuit Court of Chero-
kee county, in the case of Crawford v. John Michan, was of-
fered in evidence by the defendant. To the introduction of
this the complainant objected, but his objection was over-
ruled by the Chancellor, and the evidence received. In this,
we think, the Chancellor clearly erred. This suit is the suit
of Leah Michan, and not that of her husband; although he
is a party to the record, yet he is only nominally so. He has
no interest; the whole interest is in the wife. So far as she is
concerned, this transcript is *res inter alios*, and is incompetent
evidence. Neither a judgment against the husband, his de-
clarations, or his deed of release, would be receivable, as they
would be wholly irrelevant to the issue made by the plead-
ings. This issue is, are the slaves in controversy the sepa-
rate estate of the wife? Every thing that would legitimately
tend to prove or disprove this, is relevant. The record of-
fered does not connect itself even remotely with this propo-
sition, and, consequently, should have been excluded.

It was not denied that the deed from Nancy Renwick to
Mrs. Michan, invested the latter with a separate estate in the
slaves. Has this estate ever been legally divested, or has
she done any thing which will estop, or hinder her from set-
ting up her title against the defendant in a court of equity?
I have examined the evidence carefully, and if it establishes
one fact with greater clearness and certainty than any other,
it is, that Mrs. Michan never intended to part with her sepa-
rate interest in these slaves, nor to allow them to be sold for
the payment of her husband's debts. To prevent the latter,
when she was told by a friend that it was threatened by the
sheriff of Cherokee county, who had an execution in his
hands against her husband, she consents to send them off to
a distant county, and to take on herself the menial offices

and drudgery of the household. Hearing that their place of concealment had been discovered by her husband's creditors, she sends her son and another, and bids them hurry to change their location, and insure their safety from the officers of the law. And when, at last, they were hunted up and sold, and it was ascertained that they had brought an amount exceeding the debt for the satisfaction of which they were sold, she does not join her husband in collecting this surplus from the sheriff, but, in the language of one of the witnesses, she says: "We would like to have the money, but I will do nothing to prejudice my claim to the negroes." Even her necessities could not wring from her an abandonment of her claim.

The Chancellor predicates his decree, in a great measure, upon the supposition, that Mrs. Michan knew of, and consented to the sale of the slaves by the sheriff of Sumter county, and that she did so for the fraudulent purpose of procuring her husband's debts to be paid by a sale of the slaves, and then intending to set up her own claim against the purchaser. The proof does not warrant such a presumption; and it is a well established rule, that fraud will never be presumed; it may be inferred, when facts are clearly proved to justify the inference, but this is not the case here.

The Chancellor, however, predicates his assumption upon the supposed presence of her son, James H. Michan, at the sale of the slaves, and the further assumption, that he was the agent of his mother with full power to dispose of the slaves. Waiving the question, whether, under the deed, Mrs. Michan could herself make a valid disposition of her interest in the slaves, without the interposition of a trustee regularly appointed, and the sanction of a court of equity; it is sufficient for the purposes of this case to say, that the power given to James H. Michan by his mother, as shown by the proof, extended to the removal and hiring of the slaves, and no further. This was the extent of his power, and it cannot be tortured into an authority to sell, or otherwise to embarrass or intermeddle with the title to the property. Again; the proof is wholly silent, as to the presence of James H. Michan at the sale by the sheriff of Sumter.

It is insisted, however, that to give it validity, the deed

from Nancy Renwick to Leah Michan should have been recorded in this State. There is no necessity for this, as has been repeatedly decided by this court. It is no incumbrance on the title within the meaning of our act of assembly, but is the evidence of the title itself, held by the loanee of the slaves, who has had them in possession under it for more than twenty years. The husband does not claim any interest in them whatever; and the mere fact that the donee is a married woman, living with her husband, cannot affect her right. In such cases the possession will be referred to the title, and the husband will be regarded as the trustee for the wife. Hale v. Stone, 14 A. R. 803; O'Neil v. Teague, 8 A. R. 345; Newman v. James, 12 A. R. 29; Smith v. Ruddle, 15 A. R. 28.

It is, however, contended, that, as the defendant is a *bona fide* purchaser for valuable consideration without notice, the complainant is barred by lapse of time, and the statute of limitations, from setting up her claim against him.

Such is not my view of the law. The complainant here is a married woman, and was such when she acquired her right to this property, and when it was wrongfully sold for the payment of the debts of her husband. This being the case, she is within the saving clause of our statute of limitations, and that expressly excepts her from the operation of the statute.

There is no difference, in respect to this point, between the case under consideration and that of Sledge's Adm'rx et al. v. Clopton, 6 Ala. 589; and the same rule must govern it. In that case, the husband had borrowed money, and pledged slaves to the lender as a security for its payment; but made with him an agreement, that, if the wife of the borrower should repay the money, the slaves should be settled on her as her separate estate. The wife tendered the money, but the lender refused either to receive it, or make the settlement. This took place in 1830 or '31. The husband died in 1836, and the bill was filed in December, 1841, nearly six years after his death. The statute of limitations, as well as the staleness of the demand, was relied on in defence of the bill. The court repudiated both, and after reciting the statute of limitations, (Clay's Dig. 326 § 78, and 327 § 80,) go on to say, with regard to the former: "The case at bar is more like the action of detinue than any other form of action at law; and consequently, if

either of our statutes of limitations be applicable to it, it is the one cited. But the proviso of this act declares, that it shall not operate against a *feme covert;* and there is, therefore, no pretence for supposing that the statute began to run against the complainant previous to the death of the husband."

This same statute, (the act of 1802,) or rather the proviso to it, passed in review before the Court of Errors and Appeals of Mississippi, and received a similar construction, in the case of Curll v. Compton, 14 Smedes & Mar. 56, and the same result was attained as in Sledge's Adm'r v. Clopton, *supra.*

The coverture of Mrs. Michan still exists, and consequently the defendant will not be allowed to set up the statute of limitations against her.

From what has been said, it is evident, that the court below erred in dismissing the bill. It should have decreed for the complainants, and directed the master to report a suitable person to act as trustee for Mrs. Michan, to whom the defendant should be required, by peremptory order, to deliver the slaves, and the increase of the females among them. The master should have been also directed to state an account for hire during the time the defendant has had possession of the slaves, calculating interest on such hire from the end of each year until the time of such accounting; as well as to ascertain if any of those bought by the defendant of Williams have died since demand made, or the filing of the bill, and if so, to ascertain and report the value of such as have died. For the sums arising from the hire of the slaves, and the value of those which have died since the filing of the bill, or demand made by complainant, as above stated, he should have rendered a money decree against the defendant.

We should not hesitate to render such decree here, but we are without the necessary data. The decree of the Chancellor is reversed, at the costs of the defendant in error, and the cause remanded, that it may be proceeded in according to the foregoing directions.