# CHARLESTON.

ALICE ROBERTS *et al.* v. LINDSEY WARD *et al.*

Submitted January 27, 1920. Decided February 3, 1920.

1. JUDGMENT—*Not Conclusive as to Persons Not Parties.*

    A decree against a husband and stepfather in litigation concerning the real property of the wife and children, to which they are not parties, does not conclude them or any of them. (p. 475).

2. EASEMENTS—*User of Private Way Unobjected to Presumptively Adverse.*

    Open, continuous and notorious use by an owner of land, of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to and unprotested by the latter, is presumptively adverse to him and enjoyed under a *bona fide* claim of right. (p. 480).

3. SAME—*Private Way by Subscription.*

    Such use for a period of ten years, in the absence of proof of any circumstance altering its character, ripens into perfect title to an easement over the adjoining or neighboring land, by subscription. (p. 480).

4. SAME—*Right to Maintain Private Way.*

    A way through enclosed lands, burdened or obstructed by gates or bars and so used for such period, is presumptively a private way, notwithstanding its use to some extent by the general public, and the claimant of the way, as a private one appurtenant to his land, is not required to prove some act indicative of an indepent assertion of right, beyond that shown by his open, notorious and known user, in order to establish or maintain the easement. (p. 482).

5. SAME—*Description of Private Way in Suit to Enforce.*

    In describing or defining such a way in a bill filed for vindication of the title and right of the owner of the easement, it suffices to use such terms as would enable a person going upon the land, to find and identify the way by reference to them. (p. 483).

Appeal from Circuit Court, Cabell County.

Suit for injunction by Alice Roberts and others against Lindsey Ward and others. From a decree dissolving an injunction against obstruction of a private way, and dismissing a bill

for a perpetual injunction against such obstruction, plaintiffs appeal.

*Reversed; decree for plaintiff.*

*Meek & Renshaw,* and *J. M. Rigg,* for appellants.
*E. J. Wilcox,* and *C. S. Welch,* for appellees.

POFFENBARGER, JUDGE:

The principal grounds of the argument submitted to sustain this decree dissolving an injunction against obstruction of a private way and dismissing a bill for a perpetual injunction against such obstruction are; (1), a previous decree denying the right, relied upon as a former adjudication; (2), permissive exercise of the long user admitted; (3), lack of claim of right in the use of the way; (4), use of it in common with others, relied upon as being inconsistent with, and negativing, the theory of an exclusive and adverse right; and, (5), insufficiency of the bill by reason of uncertainty of description of the alleged way.

The former suit was brought against Sam Ward, the grantor of the defendant, Lindsey Ward, by Claude Roberts only, the husband of the plaintiff, Alice Roberts, and step-father of her children, the infant plaintiffs here. He had no title whatsoever to the land to which the way in question is alleged to be appurtenant. The decree in that cause dissolved the temporary injunction awarded therein and dismissed the bill, in general terms. The argument submitted to show conclusiveness of the decree is based upon the doctrine of privity, which may or may not obtain between the husband, on the one hand, and his wife and step-children, on the other. It probably has no application in instances in which persons having vested interests are omitted from the litigation, or do not appear in it. The wife and children are the only persons who had any actual title to the alleged dominant estate and none of them were parties. Whether the doctrine of privity applies for any perpose, under such circumstances, it is unnecessary to take the time to inquire. By way of reply to the argument, it suffices to cite the cases directly and emphatically holding a judgment or decree against a husband to which the wife is not a party, does not conclude her, even though her property is involved. *Blakey* v. *Newby,*

6 Munf. 64; *Durst* v. *Amyx,* 13 S. W. (Ky.) 1087; *Jacob* v. *Case,* 1 S. W. (Ky.) 6; *Hamilton* v. *Wright,* 30 Ia. 480; *Rogers* v. *Roberts,* 58 Md. 519; *Michan* v. *Wyatt,* 21 Ala. 813; *Read* v. *Allen,* 56 Tex. 182; *Jeffus* v. *Allen,* 56 Tex. 195; Van Fleet, Form. Adj., p. 1020. If the husband had professed to act as guardian of the two children, in the litigation, the decree would not conclude them. *Este and Longworth* v. *Strong,* 2 O. R. 478. It has been held that, ordinarily, a. judgment or decree against a guardian, respecting the property of his ward, is only *prima facie* binding upon the latter. *Serapurn* v. *LaCroix,* 1 La. 373; *Temple* v. *Williams,* 91 N. C. 82; Van Fleet, Form. Adj., p. 1017. Whether this doctrine is sound, it is unnecessary to inquire, for Claude Roberts was not guardian, and did not profess to act as such, in the preceding suit by him against one of the defendants.

The user of the plaintiffs and their predecessors in title, without objection from any person, covered a period of fifteen or twenty years, at least. The former successive owners of the greater part of the servient estate, W. J. Napier and I. M. Langdon, say they neither gave nor withheld permission to use the way. When asked whether it was used by his sufferance Napier said: "They just went over it, I never gave them any permission." When asked if he knew of anybody having or claiming a right to use it, he said: "Only through the courtesy of the land owners." When asked whether he thought he could have stopped them he said: "I did not care and I thought I had as good a right as they and they had as good a right as I had. I had to go and they had to go." When asked whether he thought those using the way had acquired the right, Langdon said: "I don't know as I could say just why, only Mr. Napier gave me the impression that it had always been an open road and had been used so long that it could not be shut up." He had purchased the property indirectly from Napier. Napier owned the servient estate before the present owners of the dominant estate obtained their title. The latter was then owned by J. F. Mayo or some person under whom he subsequently claimed and held. While Napier owned the servient estate, the former owners of the dominant estate used the road. C. C. Perdue, the former husband of Alice Roberts, one of the plain-

tiffs, obtained title to it from Mayo, in 1897, and used the road until the date of his death, 1903. From that date until 1907, when she married Claude Roberts, his widow used it. Thereafter she and her husband and children used it without objection, until about 1912, when the husband was arrested as for a trespass, at the instance of Sam Ward who then owned the servient estate, and he brought the former suit against Sam Ward, to enjoin him from interfering with the exercise of the right he claimed.

At the date of that litigation, Sam Ward owned only that part of the land over which the road in question passed, that had been previously owned by Napier and Langdon. After its termination, he purchased from Melchisedek Ward, his father, known by his neighbors as Deck Ward, about three acres of additional land over which the road runs. By a deed dated May 1, 1915, he conveyed both tracts, the Napier land and the three acres he purchased from his father, to Lindsey Ward, subject to certain reservations or exceptions, one of which was a strip twenty feet wide, covering the location of the road in question. He reserved the title in fee simple to this strip, and, by a stipulation in the deed, inhibited the grantee from selling or giving a road or passway through the land to any person, without his written consent. In this way, there comes into this suit a different piece of land from that involved in the previous suit between Claude Roberts and Sam Ward, the three acres formerly owned by Deck Ward. When he acquired his title to the principal part of the servient estate, the road from the Perdue tract ran across the Napier land and then over Deck Ward's land to a public road, and Napier was using it from his place over Ward's land to said road. If Napier used it for four years before Perdue purchased, the use thereof over Ward's land, the three acre parcel, by Napier and Perdue's predecessors in title, began as early as 1893, and Napier's use of it and that of his successors in title continued without objection, until 1911 or 1912, when Sam Ward, who succeeded Langdon in ownership of the Napier farm, obstructed the road and objected to further use of it, and Deck Ward refused to permit Langdon to remove his crop over his land without payment for the privilege. As to the Napier land, it is manifest that the

use was not under any express permission and that it was never forbidden, questioned or subjected to any protest of any kind. · Perdue, his predecessors in title and the Robertses all used it freely as of right.

In December, 1904, there was a transaction between Deck Ward and Napier, which is relied upon as proof that the use of the road over the three acre parcel of land, by the latter, the plaintiffs and others, was merely permissive and not under a claim of right. That was an effort on the part of Napier, acting for himself and others similarly situated along the road, to obtain either a public road out through Ward's land, or an open and unobstructed way, instead of one burdened by gates, there being several gates across the road, one or two on the Napier tract and three or four on the Ward tract. The plan was never consummated, but it progressed to the extent of the preparation of an agreement which was signed by Alice Perdue, now Alice Roberts, and some other parties, but not by Napier or Ward. Inconsistency and conflict in the oral testimony, as to the purpose of the enterprise, justify resort to the paper prepared for effectuation thereof. It was intended to be a transaction among the owners of all the land through which the road passed, Deck Ward, Fisher Brumfield, then owner of the Napier tract, Alice Perdue and John Haney whose land lay beyond that of Alice Perdue. It was to grant "A right of way to the public and road bed　　*　　*　　*　　solely to the use of the public;" and the road was "To be kept open for consideration that Fisher Brumfield, John Haney and Alice Perdue" were "to furnish wire to run" a "line of fence on one side of the road for and in consideration of the right of way through Deck Ward." Napier, Haney and Mrs. Roberts all testify that the purpose of the parties was to get rid of the gates across the road, and if possible, to have the road established as a public highway. The paper was signed by Brumfield, Mrs. Perdue and John Haney and his wife. For some reason, likely his sale of his land to Brumfield, Napier, the intermediary of the others, or promoter of the enterprise, did not sign it, nor did Ward. He says Ward declined to carry out the arrangement and to sign the agreement, because he was not tendered the amount of money he understood he was to receive. Mrs. Per-

due furnished her part of the wire for the fencing and it was used by Ward. Whatever the purpose may have been, its failure did not interrupt the use of the road. Haney, Mrs. Perdue, Napier and his successors, Brumfield and Langdon, used the road until after Sam Ward got the Napier tract from Langdon's son to whom he had sold. Sam Ward seems to have bought the Napier tract, some time in 1912, for Langdon had a crop on it in that year, which Deck Ward would not allow him access to over the road, until he was paid a consideration of $10 for a brief privilege. On or about August 27, 1913, Sam Ward built a barbed wire fence across the road at the line between his land and the Perdue farm and obstructed it at other points. The reasons for this act, assigned by him in his testimony, were that he did not want any road there and that he was retaliating for what he deemed to be an unneighborly act on the part of Mrs. Roberts, her refusal to let him take some lumber across the line and her attempt to force him, by such refusal, to make a deed for the road through his land. Mrs. Roberts did not use the road, after 1904, under any right conferred by the abortive agreement. And her continued use of it for eight years thereafter, without objection, argues strongly the existence of the right she claims, as well as the correctness of her version of the purpose of the effort to agree in 1904.

Deck Ward, in his testimony, claims there was no use of the road across the three acres he conveyed to Sam Ward, except by his consent. He says C. C. Perdue obtained his consent and had no right other than that so obtained; and that he believed Napier, while he owned the place between his land and the Perdue tract, asked him several times if he could use the road, and was told he might do so, "if he would furnish the wire on one side of the road, and that he got the wire." He does not say in what manner he granted Perdue permission to use the road. Perdue found the road there when he bought of Mayo, and, as the evidence indicates, began to use it, or continued the use of it. Ward does not state the time, nor, in detail, the manner, of his verbal consent to such use. The only specific thing he says on the subject is that he told Perdue he could use the road as long as he kept the gates shut. As Perdue is dead, this part of his evidence is likely inadmissible, as coming from an in-

competent witness, but, as it proves nothing, we enter upon no inquiry as to his competency. All he says about having given consent may mean no more than that, after Perdue bought the Mayo farm, he used the road as his grantor had used it and that Ward made no objection to his going through the three acres and his other land lying near the county road. If he told Perdue he could use it as long as he kept the gates shut, that does not necessarily mean anything more than that Perdue was cautioned that the road he had was subject to the burden of gates and that he could not use it as an open way. Perdue did use it until 1903, the date of his death, a period of six years. One year later, Napier undertook by negotiations with Ward to get the road made a public highway, or an open road free from gates, with the view of ultimately making it a public road. Ward defeated that enterprise, but, for eight years thereafter, he interposed no objection to the use of the road by the owners of the Napier tract and the Perdue or Roberts tract. If, as he contends, the negotiations by Napier were for a right of way and not for a change of the character of the right of way they had—to make it an open and unobstructed way instead of a way obstructed by gates—it is hardly likely that he would have permitted the use of the road thereafter in the same manner in which, and to the same extent to which, it had been previously used. If the negotiation grew out of, or was based upon, any objection interposed by him to the use of the road, it would have been most natural for him, after the failure thereof, to forbid further use of the road. His testimony as to a grant of permission to Perdue is very short, indefinite and inconclusive and what he says about Napier's application to him for a permit is referable to, and explained by, the negotiation conducted by Napier. Obviously, it was an effort to obtain an open and unobstructed way and nothing more. Deck Ward's testimony must be read and interpreted in the light of his conduct. Actions speak louder than words, and his words can be made to harmonize perfectly with his acts, as has been shown.

Our conclusion as to this phase of the case is that there was no express grant of permission, nor any protest against the use of the road, until recently, and that what are relied upon, as grants of permission, amounted to no more than mere ac-

quiescence on the part of Ward, Napier, Brumfield and Langdon in the use of the right of way, by the owners of the Perdue tract. Under principles declared in _Walton_ v. _Knight,_ 62 W. Va. 223, and numerous other cases therein cited, such use and acquiescence, for the long period of time above indicated, conferred upon the owners of the Perdue tract a right of way by prescription, if the road was used under a _bona fide_ claim of right and the quality of the user was not impaired or limited by the enjoyment thereof in common with the general public.

For proof of lack of a _bona fide_ claim of right, as the basis of the user by Perdue and, after him, by his widow and children, certain admissions made by Mrs. Roberts, her husband and her father-in-law, J. H. Roberts, are relied upon. Mrs. Roberts said in her testimony, in response to questions as to whether she claimed the right to use the road: "I never heard anything about any right at all," and further, that she had never heard her first husband speak of it. J. H. Roberts said he never knew whether C. C. Perdue claimed any right, nor whether his daughter, Mrs. Roberts, claimed any right to the use of the road, before the attempt of 1904 to make a contract. Mrs. Roberts, however, in the same connection, insists that they had always claimed a right to use the road, and, in the admissions of lack of claim, she was evidently confused at first, as to what was meant by the expression. She evidently thought the questions propounded to her related to a claim of title by deed. Her husband also testified positively that she had always claimed right to use the road. J. H. Roberts' testimony as to this is purely negative in character. He said no more than that he did not know whether C. C. Perdue or his wife had claimed right of user. None of this testimony carries any admission of a permissive use. As long as there was no objection, there was no occasion for any assertion of right. Perdue succeeded to the right of J. F. Mayo, respecting the road way over the Napier farm, and he exercised that right without any objection, just as he used the right of way over Ward's farm, the one nearer the public road. No objection having been interposed, it was perfectly natural that he should exercise the right without an express declaration of its existence. Hence, it was not remarkable that his wife never heard him say anything about it. For the same

reason, she exercised it after his death without any declaration of right. In the absence of proof to the contrary, every trip over the road was an assertion of right. The user itself, for the statutory period of time, ten years, established *prima facie* a *bona fide* claim of right *Walton* v. *Knight,* 62 W. Va. 223; *Wooldridge* v. *Coughlin,* 46 W. Va. 345.

The evidence of use by the plaintiffs in common with the public is slight. Some witnesses say they have traveled the road in question, in going from one to the other of the two public roads it connects, when considered as a whole. Others say everybody used it that wanted to. The end of the road not involved here is poor, rough and inconvenient. In view of its character it cannot be supposed to have been used extensively by the general public. Under some circumstances, it might conclude the plaintiffs from use of the right they claim, as an exclusive one. But the conditions do not bring the case within the doctrine relied upon. Presumptively, they did obtain it, *Reed* v. *Garnett,* (Va.) 43 S. E. 182 and *Kent* v. *Dobyns,* (Va.) 72 S. E. 139. The doctrine is limited, in its origin in South Carolina and some of the New England states, by an element or factor not mentioned in those cases, but which no doubt appeared in them. That is the open and unenclosed character of the land, on which a road commonly used, is located, or the open character of the road through enclosed lands. *First Parish* v. *Beach,* 2 Pick. (Mass.) 59; *Kilburn* v. *Adams,* 7 Metc. (Mass.) 33; *Plimpton* v. *Converse,* 44 Vt. 158; *O'Neil* v. *Blodgett,* 53 Vt. 213; *Strong* v. *Wales,* 50 Vt. 361; *Rowland* v. *Wolfe,* 1 Bailey (S. C.) 56; *McKeen* v. *Garrett, Id* 341. In all of the cases just cited, the roads ran through unenclosed lands. In the following cases, open and unobstructed roads seem to have been involved: *Price* v. *Wilburn,* 1 Rich. L. (S. C.) 58; *Day* v. *Allender,* 22 Md. 511. Such may have been the character of the roads in question in the two Virginia cases relied upon by counsel for the appellees. The cases in which it has been held to be competent for the claimant to prove some act on his part indicating an independent assertion of right in the way, peculiar to himself and exclusive, as regards the public, and thus establish in himself a private easement in a way commonly used, have involved, as a general rule, either roads over unen-

closed lands or open roads through enclosed lands. *Fitchburg R. Co.* v. *Page,* 131 Mass. 391; *Webster* v. *City of Lowell,* 142 Mass., 324; *Ballard* v. *Demmon,* 156 Mass., 449; *Angenett* v. *Elliott,* 134 Ill. 156; *Wanger* v. *Hipple,* (Penn.) 13 Atl. 81. The difference between such roads and one running over enclosed lands and burdened with gates or bars is obvious. An open road is an apparent invitation or permit to the general public, and all who use it enter upon it presumptively as citizens, members of the general public, and not otherwise. The claimant of a private right in it must rebut the presumption against him arising from the apparent situation. On the other hand, a road through enclosed lands with gates across it is apparently a private road established for the use of the owner of the land or some one else or for himself and others. Presumptively, therefore, those who use it regularly, as adjoining or neighboring land owners, to the full enjoyment of whose properties it is necessary or manifestly conducive, are exercising private rights. The presumption takes its color and character from the apparent nature of the way, it being against the claimant when the way is apparently public, and for him when it is apparently private. The rule is one of evidence only, for there may be a private easement in a road or way commonly used. The only difference between it and one used only by the claiment or by him and others similarly situated and apparently private, lies in the nature and amount of the evidence required to establish it.

The remaining contention is obviously untenable. The bill and amended bill describe the road as being one well marked and continuously used, and the latter says it "follows the top of the ridge mainly and is the only right-of-way and roadway leading over the said Lindsay Ward tract of land from the plaintiff's said land to the said county road." It suffices to use such descriptive terms as would enable any person going upon the land to find and identify the road by reference to them. This need not be done according to any formula or in any particular manner. The allegations of these bills go far beyond those of the bill in *Crosier* v. *Brown,* 66 W. Va. 273.

Our conclusion is to reverse the decree complained of, reject the plea of former adjudication, overrule the demurrer to the

amended bill and enter a decree enjoining, restraining and inhibiting the defendants agreeably to the prayer of the said amended bill.

*Reversed; decree for plaintiff.*